Our fourth case for this morning is Turnell v. Centimark Corporation.  If the court please. The issue before the court is whether or not the district court in granting a preliminary injunction abused its discretion. The district court chose to issue an injunction despite the fact that it was dealing with a contract of employment that it found, in a very meaningful part, to be vague and unfair. It was a contract between the largest single roofing company in America and a 28-year-old former roofer. It effectively prohibited, and I'll get to this in a moment, your honors, it effectively prohibited him from competing or engaging in the roofing business anywhere in the United States. Now you're talking about the agreement, not the blue-penciled result. Exactly right, Judge. And what I'm understanding, I don't understand you to be saying the injunction itself is unreasonable, but that the judge should never have gotten to that because of the nature of the agreement. Exactly correct, your honor. And let me just explain that. There is a doctrine that modifies blue-penciling. It is defined in Pennsylvania, it's throughout the country, in those states that allow covenants, that says this. Courts ought not blue-pencil agreements where those agreements are so overbroad and oppressive. The court in Redding and Sidco, the Supreme Court opinions from Pennsylvania, use the term gratuitously overbroad. But in Sidco, of course, they do affirm a blue-penciled injunction. And what I'm curious about, you do have Redding, no question about it, and so there is some place where it's just so oppressive that the Pennsylvania Supreme Court says it simply has to be set aside. But on the whole and by and large, Pennsylvania seems amenable to the equitable power of the covenant that might be overbroad. And there are a number of cases in which the Pennsylvania, Hess is another one where the Pennsylvania court has done that. And I guess looking at this agreement, which at the time it's signed, there's consideration for it. He's getting a promotion. They don't know where he's going to work over the years, so they say wherever you work. And the purposes are well-understood purposes for covenants not to compete, to protect trade secrets, to protect customer lists, to protect the company's pricing decisions, just the usual things. So those are all entirely ordinary parts of a covenant not to compete. Your Honor, I agree with everything the court has said with this qualification. The agreement they entered into didn't say wherever you work within the next two years. Now, I know it didn't. I'm saying wherever you work, period. I understand your argument about that. Okay. And Judge, what happened was this. So you have this little map with the 24 states, and we looked at that. Well, and Judge, let's look at that. They create an agreement that they know can only go one way. It'll expand. They know when they enter into it that it's going to expand. But they don't know by how much. I mean, they might have just left him in Illinois forever, and it wouldn't have expanded. And Judge, if they had done this when he left, after working in 24 states, and this doesn't address this point, Judge, let me just make this first. Okay. Customers. Thou shalt not do business with any customer of ours ever, whether you know who he is, whether you don't know who he is. It goes so far as to say, thou shalt not do business with prospective customers. And that means this. Anybody we've solicited, successfully or unsuccessfully, for as long as you work for us, and any prospective customer or customer that we get in the two years after you leave. Now, Your Honor, if, if, ready means anything. And there's also the Fresco case, the only district court case that has addressed this that said, we're not blue-penciling this. We're not blue-penciling this because the employee couldn't have understood what, in that case, lines of business, he was prohibited from dealing in. So, but let's look at this one then. I think it's where you've got it here on page eight of your brief. This is 4.05. So I don't see anything he wouldn't have understood. He wouldn't understand the regions or divisions or territories in which he has operated, right? Judge, I think that's one of the arguments that's advanced by CentiMark is this. He understood it. Okay, so you just said people wouldn't understand these things, but we've agreed then that he at least understands what this is. Judge, the issue, I don't think I've ever said he didn't understand it. The fact of the matter is, people can enter into unlawful agreements that they understand. In 17 and 1800s, when they had indentured servitude, if the person was literate, they would have wasted seven years of my life for room and board. The issue has never been in covenants not to compete whether it was understandable. The issue has always been whether they're reasonably related to the interests of the employer and they're reasonable in terms of geography and time. That's the standard law on covenants not to compete. But you've just agreed with Judge Tinder that what the district court actually resolved to do at page 10 of its opinion and then repeated in the judgment order isn't what you're complaining about because that is a far narrower set of prohibitions than this 4.05 and 4.06. We have to decide under Pennsylvania law, is this so egregious that it's beyond reformation or is this in the zone of things that is subject to the court's equitable plan? I absolutely agree, Judge. That's the issue. If this is not outside that zone, what contract could be? Because here's where it left Jim Turnell. Don't work anywhere in the United States for the rest of your life in the roofing business. No, for two years, Judge. No, I'm saying, you said what contract would be so egregious and so I suggest if there were a hypothetical contract that said you may not work in the roofing business ever again in the United States for the rest of your life, that would be so far out of bounds, I don't think a court could fix it. And let me try this one, Judge. Thou shalt not work in the roofing business for two years after you leave us because, not because we have any legitimate business interest to protect, but because we've told you that the geographic area is these 24 states and with the customer restrictions, which also must be reasonable, Judge, the fact of the matter is we get into this mantra of covenants this is not to compete, reasonable in geography, reasonable in narration, this is not reasonable in geography when it comes to the time to enforce. But this is a national company. Judge, he wasn't a national employee. But it's a national company that he might have known something about the states beyond his, it's actually a six state area, right? Judge might have, it's not a basis to, excuse me, Judge. No, I was just trying to recall the actual scope of his final job there. Six states, Judge. Six states. Judge, my point is this. I agree with the court that a prohibition that said thou shalt not engage in the roofing business forever crosses the line. I would also say to you that an agreement that says thou shalt not be in the roofing business in which you've been for your entire 35 year career for two years is beyond the pale. The courts also go into oppression. And this isn't a question where Senator Merrick woke up when he left and said, you know what, this is over broad. We don't want to suggest that we'd ever enforce this against this guy nationally. No, they wrote letters to him saying we're going to enforce. Yeah. And if there is not an indication, Judge, of oppression or an intent to enforce an over broad agreement, those letters and indeed what they filed in court, their complaint says we want to enforce these provisions as written. Right. And so when it only comes to the point in the reply memorandum in support of the motion for preliminary injunction, where they finally say we're losing, let's narrow this to the Midwest. Your Honor, the issue here is if you affirm this as the court concluded in Fresco and it's at the last page of our brief, if you allow employers to overreach and threaten employees and you allow courts to go back and blue pencil into reasonableness, it gives employers an incentive to do exactly what Senate Mark has and will continue to do. But what do you do about Hess? There the court says the 2002 Pennsylvania Supreme Court, when covenant imposes restrictions broader than necessary to protect the employer, we have repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions that are reasonably necessary. Now I agree that there's some incentive for employers to write too broadly and rely on But that's what Pennsylvania has done. Judge, I think Hess is, I'm not against blue penciling and blue penciling by definition is a situation in which the provision the court's dealing with is broader than it's inclined to enforce. It's too broad. And it narrows it. But the fact of the matter is, and the courts put it well, does this cross that line? And I don't think the line is you can never be in the roofing business forever. That quite honestly is a provision we're never going to see. But I think that where you've got a local employee and the agreement, and they know the agreement means this, says you can't operate in the roofing business for two years. They admit it in their reply or their responsive brief when they said, well, even if it had been literally applied, he could go live on his pension. Well, it's not let him eat cake. The fact of the matter is an agreement which they intended to mean thou shalt not be in the roofing business for two years crosses the line. I'm fine with Hess, Judge. That wasn't that kind of situation. It was a much narrowly drawn agreement. And if a court says, gee, you've got a six state restriction, we think you only proved up a state, that's a legitimate use of the redlining. And in this case, Judge, I think a situation, and there is the question, Judge, as to whether the district court got the geographic area right. Yeah, I'm interested in whether you're arguing that. I thought you weren't. Judge, I am. Because she adds one state. She adds two states. She adds Minnesota, which wasn't part of his final territory, if I'm remembering correctly. I think it was, Judge, but in any case, the instructive, I think, statement concerning whether the judge got the geographic area right is at page seven of her opinion, page seven of her appendix, where the court says, this court need not determine whether the reasonableness of the full geographic scope of the covenants, a question in and of itself as to whether the court should have ignored that. But then it goes on, because restricting, because restricting Turnell's activities in the Midwest was, was reasonable. Not what she's doing is going to be reasonable, was reasonable. I think if you take that, along with the court's statement that, so she's excluding California, Texas, Florida, and Georgia, the whole East Coast, I mean, there are a lot of areas. No, Judge, my point is different. My point is that the district court judge misinterpreted the geographic restriction in the contract to mean that CentiMark was only restricting him to where he had been within the last two years. The fact that- There's some debate between you and the covenants about that. I agree with that. But, Judge, when you look at the statement I just read, and it said restricting him to where he'd been the last two years was reasonable, that's a misreading of the contract. The contract said anywhere he'd ever been. But the real issue, Judge, comes back to your point. Does this cross the line or not? And if it doesn't cross the line, what does? And my final point is this. There is not one case in Pennsylvania where an agreement like this, national in scope, for at best a regional employee, was ever redlined. Thank you.  Thank you very much. Mr. Huff? Thank you, Your Honor. May it please the court. My name is Anthony Hoppe. I represent CentiMark Corporation. As the court has pointed out, Pennsylvania law on the enforceability of restrictive covenants essentially falls into three categories or three buckets. The first category is cases where the restrictive covenants are deemed reasonable and enforceable on their face. Not a lot of litigation about those, not surprising. The second category is cases in which the court finds that the restrictive covenants protect legitimate business interest but are broader than necessary to protect the employer and they've granted enforcement of those restrictive covenants, albeit in a more limited frame. They narrow, blue pencil, whatever you want to call it. And the final category of these cases where the restrictive covenants are, as Mr. Dahl said, so gratuitously overbroad so as to indicate an intent to oppress the employee and or to foster a monopoly. So the Redding case, for example. And that category is acknowledged in the Cidco case, even if they say we don't happen to have one here. But they certainly reaffirm that there is such a category. Exactly. And as this court has, I believe, pointed out, the vast majority of Pennsylvania cases fall into that middle category. Most of the time, the court looks at the agreement at the time that it was formed, looks at the effect of the agreement even afterwards and says, serves legitimate business interest, served the legitimate business interest given what the parties knew at the time. And now today, looking at it in hindsight, there are things that we think we need to the employer actually doesn't need. And that's exactly what the court did here, as Your Honor has pointed out. So here's the problem. Why not draft a covenant that's right out at the edge, as maybe you did, saying anywhere you've ever worked in your life for this company, knowing that you transfer people all over the country and saying, you know, existing and prospective customers and things that the person wouldn't necessarily, you know, of course, you have that in 4.06. The term prospective customer means anybody contacted by CentiMark, he may have no idea about that and say, oh, well, let's just go for the widest possible thing and the court will bail us out. Well, I think the reason not to do that, if an employer has decent advice, is Fresco. I mean, Fresco is a case that is nowhere near this case, but I mean, look at Fresco. It was national in scope, even though the employee wasn't. There was no consideration, and it covered business lines that the employee didn't even know about. So it's a completely different case. And going back to this agreement and whether it's wherever he worked, it's not. There's a couple of issues there, Your Honor. And I think maybe they're not clear enough in the briefs, but we can go back to the record and talk about these things. It doesn't say wherever you worked. It never, it does not say that. It says in any regions and or divisions and or territories as established by CentiMark in which the employee has operated as an employee of CentiMark. Does that mean did he work? Well, why is that where you worked? All right. But let's think about the evidence in the district court. CentiMark introduced evidence that Mr. Turnell operated, he actually was the operations manager for the Midwest division. All of the evidence in the district court focused on the Midwest division, except, and I'll get to the map in a second, there was proof that his territory was, let's see, western Michigan, northern Indiana, northern Illinois, Wisconsin, Minnesota, North Dakota, and South Dakota. And he admitted that, and CentiMark's witnesses proved that. So why, I mean, actually in the appellant's brief, pages four to five, they don't happen to list Minnesota. That may just be a typo. But I was curious why the district court's injunction didn't just track his territory. And the ways in which it doesn't is, again, looking at his brief, northern and central Illinois, western Michigan, northwest Indiana. So the district court doesn't divide the states up. It's been sort of this throwing around, northwest Indiana is not the same as northern Indiana. That's true, yes. I mean, there's... We have Indiana experts here, I'm sorry. We have two experts on the panel, actually. But whether you say northern Illinois or all of Illinois, it makes a difference. The court, I can't really answer why the court didn't follow his territory exactly, but roughly got it. But from a commercial point of view, it makes a huge difference if you're talking about northwest Indiana, which is usually thought of, as far as I've thought, kind of the Chicago area versus, you know, all the way down to Indianapolis, which is a whole different economic zone, if you will, in the state. And what we asked for in the district court, what CentiMark asked for, was to restrict him to the territory he previously served. So you wouldn't have any objection to reforming the injunction to map exactly what his territory was? That's what we asked for, Your Honor. I would have no objection to that. Well, I mean, so in other words, it would say instead of Indiana, it would say northwest Indiana. Yes, Your Honor. Okay. But let's talk again about the proof of wherever he worked ever, all right? Are you going to talk about the 24 states now? Sure, the 24 states. The way the evidence came in was that at the hearing, Mr. Turnell got up in the stand and his attorney held up the map and said, did you work in all of these states? He said, yes. That's really about the only evidence there is about what he ever did in any of those other states. The agreement, you know, it does say, it says you read it to me wherever he worked, I say wherever he operated. He has to operate it as an employee in that state. Well, suppose he made a sales call once in California on behalf of CentiMark. Hypothetically, I have no idea if he did or not, but suppose he did. Wouldn't that under this covenant appropriately mean that California is on the list? I would say no, Your Honor. I would say there has to be a sort of a reasonable sort of de minimis reading of that. More than one sales call, but less than having your office there? He has to operate as an employee there. Well, I don't know. It seems like a sales call is operating as an employee. Well, his base of operations was the Midwest, if they called in. It was always the Midwest. It was never not the Midwest. Well, when the enforcement letters went out, though, that wasn't the position taken. It was much broader than that, wasn't it? I think the enforcement letters simply tracked the language of the agreement and said, comply with the agreement. Comply with what it says. Without citing even the agreement, it said comply with Section 4.05. Which would have implicated all 24 of these states, wouldn't it? Not the way we read it, Your Honor. That is, again, if he had a cup of coffee in California once, went out and said, we've got a special issue with a customer, you've got to go out and talk to him, he's not operating California. He operated, literally, was the director of operations in the Midwest. That was his territory. He never left it. He never had an office in California. I'm not saying he needed to have an office. Let's say we sent him out for three months, had him work in California for three months. I mean, that's different from take a sales meeting. That's operating your division, but going on a special assignment. I don't know where there's any evidence in this record that this unusual definition of operated that you're suggesting is something that was mutually understood by him and CentiMark. I didn't think of it, certainly, reading the briefs. I don't know how it couldn't have been. His office was in West Chicago. He operated in all of these states. No, we all understand, by the end of his career with the company, he's based in the Midwest and he's in the Chicago area and he's dealing with these various other states, but his concern is that it's a much earlier point in his career when he signs this agreement, right? True. True. And I gather from the briefs, although I'm happy to be corrected, that over the years he did work in all of the states that he's highlighted in this map. The evidence on that is very thin, Your Honor. I mean, the evidence was beginning, middle, and end. He was situated in Chicago and worked in the Midwest, so what he did in those other states is not at all clear. There's no evidence of that, actually. But again, to your earlier point, Your Honor, to go back to it, at the beginning in 1988, the relationship could have lasted a year, could have lasted five years, could have lasted as it did 20-some years. So he could have been stationed in Chicago and then he terminates and... Let me ask you this. How often are your clients, similar to you, that is, nationwide clients, where you would deal with somebody that needs roofing at 15 stores across the country? Sure. There is, and I don't know if there's a lot of evidence on this, Your Honor, but CentiMark does have... VTAC versus, CentiMark versus VTAC, exact same agreement, exact same language. VTAC was a national sales representative, so he had national responsibilities. His accounts were nationwide and he dealt with them on a national basis. Mr. Turnell was not a national sales representative. He was a regional operations person who had sales responsibilities in his region. So if I understand correctly, if, say, Target needed roofing, it would go to the national sales representative, not to... Most likely, yes, Your Honor, but the regional people would help out, you know, as roofs needed to be done. But in terms of the sales responsibility, yes, he was more on a regional basis. I want to go back to the issue that Mr. Dahl raised about working in roofing. Thou shalt not work in roofing. There's no commandments here. Thou shalt not doesn't appear, but work in roofing. The agreement restricts Mr. Turnell from working in a competing business. And again, this, unfortunately, is not in the brief. We didn't get granular enough, but competing business, CentiMark, and it's in the record in the district court, sells commercial, flat, single-ply roofing. CentiMark doesn't sell shingles. CentiMark doesn't sell built-up roofing. That's that tar paper roofing that you see. CentiMark doesn't do pitched roofs. So there are areas of roofing, even, you know, given 4.05, 4.06, that Mr. Turnell had available to him without violating the agreement. So it doesn't protect every roofing customer. It doesn't protect every roof in the United States. So it was limited to this particular style of flat roofing? Competing business, yes. And we introduced... Those other types of roofs could also be involved in commercial roofing, couldn't they? They could, but it's not covered by the contract. That's too broad. It's not a competing business. But it doesn't say competing business. It says related to commercial roofing to any person. The agreement says if 4.05 and 4.06 are limited, there's sub-paragraphs in each one of them that limit it to the prohibition on doing business with customers, et cetera, shall not prohibit an employee, skipping here, from engaging in or for the promotion or purposes of a non-competing business. So the question, though, I thought Judge Tinder was raising, if you look at the district court's injunction, she says don't do any of these things related to commercial roofing. So maybe what she should have said is commercial roofing that's competitive with CentiMark or somehow get... Right. That would have been a more precise way to word it. Again, CentiMark's business is commercial, flat, single-ply roofing. So built-up roofing is something different. That's, as I said, tar paper is multi-... People use that kind of roofing where it's... Membrane system. Yes, the membrane system. It's a large swath of the roofing industry. We're not denying that, but it's not... So warehouses, targets, et cetera, those kinds of points. Most of them are the single-ply roofing, but there are buildings that have something else. So again, it's just there's some hyperbole going on here, Your Honor, and I wanted to point that out, that it's not... You can't go anywhere in the country, it doesn't say that, and it doesn't say you can't work in roofing at all. With respect to customers and prospective customers, that is broad language, but that operates outside the area where it's covered by the non-compete. And quite frankly, I think the court reached the right decision, which is to say it may be broader than reasonably necessary for the protection of the employer, but the court has the discretion, exercise the discretion, to limit that. At the time that it was entered into, the parties presumably thought it was reasonable. It doesn't look unreasonable on its face. In application, it may be a little bit more difficult than it needed to be, and for that reason the court found a rationale to restrict it. So in conclusion, Your Honor, I believe that this case falls squarely within that middle ground in Pennsylvania, where most of the reported Pennsylvania decisions fall. This is a lot more like SIDCO, where in SIDCO, the agreement covered everywhere that SIDCO operated, and the court pointed that out. Everywhere that SIDCO operated, on its face, at the time, a reasonable thing for SIDCO to ask the employee to bind himself to. In application, later on, it turned out that the employee worked in a narrow band of where SIDCO operated, and therefore the court restricted it to that band. Perfectly legitimate. This is not Fresco. This isn't Redding. Redding, just to go back, Redding was a regional airport. The restriction was not limited in time or place. Just, it doesn't, you know, strike one, strike two. It has to be limited in time, limited in place. Redding was an easy case. Fresco was an easy case. Again, not limited, no consideration, oppressive in terms of business lines that the employee had never even heard of. So unless the court has any further questions, I thank you. No, thank you very much. Anything further, Mr. Dahl? These points. In the trial court, there was never, never, any question raised by CentiMark that our interpretation of the 24 state region was inaccurate. They don't raise it in their briefs. I'm not going to ask the court to go back and review it, but this is the first I've heard of. It really was in 24 states. It was a national prohibition because, as they now admit, customers meant anybody they'd done business with for 35 years, they'd turn out, testified without contradiction, I don't know who those people are. And he couldn't have. Prospective? The court found it vague, unfair, there's no way he could have known, and the prospective demonstrates both the oppression and the overbreath of this. Prospective included people they talked to two years after he left. Your honors, I think that with respect to the Fresco case, it didn't go off on consideration. It went off on this. The prohibition said, thou shalt not engage in lines of business that are under consideration. The court said he couldn't have known what lines of business were under consideration in the same way that Jim Turnell couldn't know who the customers were or the prospective customers. The court in Fresco would have done exactly, if it were here, it would have done exactly what it did there with a far less oppressive provision. Your honor, I closed my remarks earlier with two comments. There is no case in Pennsylvania which has ever redlined an agreement like this. Two years, national, no way you could know what you're doing, it's never been redlined. There's no suggestion by them that there is such a case for a local employee. On the local employee side, Jim Turnell is going to tell me in a moment, I started in Massachusetts, I'm a Massachusetts kid. I was in the East Coast, I was in the West Coast, I was assigned to those regions. Your honor, finally we have to address, and they didn't, this. The consequences of affirming this district court is to say to employers, write this broad provision, not two years forever for your life, but write a provision that says national for two years and trust us, district courts will redline it, you'll be okay, Mr. Employer, and maybe all the employees that you send letters to will be so scared or not have enough money to litigate it that they're going to do what you want, which is to get out of the business. Thank you. Thank you very much. Thanks to both counsel, we'll take the case under advisement.